RTP:PP
F. #2021R00894

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A PINK APPLE IPHONE BELONGING TO DEFENDANT KRYSTLE BURRELL WITH IMSI NUMBER 313100006897975 AND CURRENTLY LOCATED IN THE EASTERN DISTRICT OF NEW YORK | **APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE**<br><br>Case No. 22-MJ-437 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

    I, Dianna Oglio, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

    1.    I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—an

electronic device—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

    2.    I am a Special Agent with the United States Department of Homeland Security,

Homeland Security Investigations ("HSI"), and have been since 2018.  I am currently assigned to

the New York Violent Gang Task Force.  My official duties and responsibilities include

conducting and assisting in investigations into the activities of individuals involved in gang

activity, including smuggling contraband to gang members in correctional facilities.  I am

familiar with the facts and circumstances set forth below from my participation in the

investigation, review of the investigative file, and from reports of other law enforcement officers

involved in the investigation.  I have also received training, and have experience, in the execution of warrants for electronic devices of the sort requested herein.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4.      The property to be searched is a pink Apple iPhone with IMSI number 313100006897975 belonging to defendant Krystle Burrell, referred to as the "Device."  A photograph of the Device is included in Attachment A.

5.      On March 31, 2022, the Hon. Vera M. Scanlon issued arrest warrants against Terrae Hinds and Krystle Burrell.  (22-MJ-378)  In sum and substance, the complaint and affidavit submitted in support of the arrest warrants ("Complaint"), which is attached hereto as Exhibit A and incorporated by reference, alleges that New York City Correction Officer Krystle Burrell received bribes in exchange for smuggling contraband into the Anna M. Kross Center on Rikers Island for Rikers island inmate Terrae Hinds, facilitating Hinds' contraband smuggling business and permitting Hinds and others to violate DOC regulations.  Hinds arranged for approximately $9,780 in bribe payments to be sent to Burrell.  Burrell smuggled at least two unauthorized cell phones to Hinds.  Burrell also facilitated Hinds' sale of narcotics and other contraband items at the Anna M. Kross Center by accepting payments for contraband on his behalf and by providing her preferred method of payment to one of Hinds' incarcerated customers.  As set forth in the Complaint, Hinds is a member of the Bloods street gang.  Further, as set forth in the Complaint, the evidence shows that Hinds and Burrell appear to be in a personal or sexual relationship.

6.     On April 5, 2022, law enforcement officers arrested Burrell and seized the Device incident to Burrell's lawful arrest.  The Device is currently located within the Eastern District of New York.

7.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.     Based on the information discussed below and in the Complaint, I submit there is probable cause to believe that Burrell, Hinds, and others conspired to violate the Travel Act (Title 18, United States Code, Section 1952), in violation of Title 18, United States Code, Section 371, and that evidence of the Subject Offenses can be found on the Device.

9.     First, as a general matter, based on my training and experience, involvement in this case, and conversations with other law enforcement officers, individuals engaged in bribery schemes and contraband smuggling use cell phones and other digital devices to, inter alia, communicate with co-conspirators and arrange for the receipt of money and contraband.

10.    Second, as set forth in the Complaint, Burrell received nearly $10,000 of bribes via Cash App and Zelle, two mobile platforms designed to send and receive money.  Subpoena returns from Cash App indicate that Burrell accessed the application using an iPhone.  I know based on my training and experience that a search of a mobile phone will allow law enforcement to view the activity in these mobile payment applications.  Thus, there is probable cause to believe that the Device will have evidence of Burrell receiving payments via Cash App and Zelle, which will provide further evidence of her committing the charged offense.

11.    Third, as set forth in the Complaint, Burrell continues to use a cell phone to communicate regarding contraband smuggling.  On or about March 14, 2022, Hinds, Burrell and

an individual identified as Inmate 3 in the Complaint had a three-way call through the Rikers

Island phone  system during which Inmate 3 appears to ask Burrell to be an intermediary for

payments to another correction officer to smuggle contraband.  During the call, Inmate 3 asked

Burrell, "Yo sis . . . what's the word" and Burrell replied, "He said he spoke to you or he was

coming to speak to you or something."  Inmate 3 told Burrell that "he's" a liar, which I believe is

a reference to the unnamed correction officer.  Inmate 3 appeared to express his frustration with

the correction officer not meeting him even after Inmate 3 got everything "sturdy" (which I

believe means ready) including "bread" (which I believe means money).  Hinds asked Burrell to

text "him" while they were on the phone.  Burrell stated that she texted him and was waiting for

an answer.  During the call, Burrell then stated, "he's FaceTiming me," meaning he was calling

her via video, and Hinds and Inmate 3 told her to answer the call.  I know that "FaceTiming"

means using the FaceTime feature of an iPhone to receive a video or audio call via the internet.

Thus, there is probable cause that a search of the Device will yield evidence of who Burrell

communicated with at the time of this call and the content of any text communications, and thus,

provide evidence of Burrell working with Hinds and others to coordinate additional contraband

smuggling.

      12.    Finally, as set forth in the Complaint, Burrell and Hinds appear to be in a personal

or romantic relationship in violation of DOC policy.  Burrell facilitated Hinds' release on bail

from custody and discussed their sexual relationship on recorded calls.  Based on my training

and experience, individuals in personal relationships often use text messages or other electronic

communications to communicate.  Further, law enforcement received phone records from T-

Mobile for 917-561-6436 (the -6436 number).  Based on calls recorded by DOC on the Securus

system, inmates have been calling Hinds on this -6436 number.  Records from T-Mobile of the -

4

6436 number indicate that Burrell and Hinds exchanged approximately 13 text messages in March 2022.  Personal discussions between Hinds and Burrell will provide further evidence of their relationship that is relevant to the bribery offenses.

13.     The Device is currently in the lawful possession of HSI in the Eastern District of New York.  As discussed above, on or about April 5, 2022, Burrell was arrested.  The Device, which was in her possession, were seized incident to his arrest and kept in HSI's custody.

14.     In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of HSI.

**TECHNICAL TERMS**

15.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

5

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

6

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets,

7

and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

16.    Based on my training, experience, and research, I know that the Device has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

18.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

9

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device

10

consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

21.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Dianna Oglio
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me by telephone
on April 15, 2022:

/s/ Roanne L. Mann

HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

11

# EXHIBIT A

RTP:PP
F.#2021R00894

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – X

UNITED STATES OF AMERICA                          COMPLAINT

     - against -                                (T. 18, U.S.C., § 371)

KRYSTLE BURRELL and                               22-MJ-378
TERRAE HINDS,
    also known as "Tomato Sauce,"

        Defendants.

– – – – – – – – – – – – X

EASTERN DISTRICT OF NEW YORK, SS:

        DIANNA OGLIO, being duly sworn, deposes and states that she is a Special

Agent with the Department of Homeland Security, duly appointed according to law and

acting as such.

        In or about and between June 2021 and July 2021, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KRYSTLE BURRELL and TERRAE HINDS, also known as "Tomato Sauce,"

together with others, did knowingly and intentionally conspire to use one or more facilities in

interstate and foreign commerce with intent to promote, manage, establish, carry on and

facilitate the promotion, management, establishment and carrying on, of one or more

unlawful activities, to wit: Bribe Receiving in the Third Degree, contrary to New York Penal

Law Section 200.10; Bribery in the Third Degree, in violation of New York Penal Law

Section 200.00; and Criminal Liability for Conduct of Another, in violation of New York Penal

Law Section 20.00, and thereafter to perform acts to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on, of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3).

(Title 18, United States Code, Section 371).

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been since 2018.   I am currently assigned to the New York Violent Gang Task Force.   I am familiar with the facts and circumstances of this investigation from my personal participation in the investigation, review of documents, and discussions I have had with other law enforcement personnel. Additionally, statements attributable to individuals herein are set forth in sum and substance and in part.

I.      Background

2.      HSI, the New York City Department of Investigation ("DOI"), and the New York City Police Department ("NYPD") are investigating the smuggling of contraband, including cell phones and narcotics, by correction officers working at Rikers Island to incarcerated individuals, including members of the Bloods, a street and prison gang that operates in New York City and across the United States.   Members and associates of the

---

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

Bloods engage in narcotics trafficking and commit acts of violence, including murder, robbery, and assault, among other crimes.

3.      In connection with this investigation, agents have, among other things, reviewed surveillance video, financial records (including those related to online monetary transfer tools such as Cash App), conducted surveillance, and seized contraband.

4.      Law enforcement agents have also reviewed recorded telephone calls made by incarcerated individuals using New York City Department of Correction's ("DOC") Securus system.   To use the Securus system, each incarcerated individual is assigned a personal identification number ("PIN").   Although incarcerated individuals are required to use only their assigned PIN to make outgoing phone calls, in practice individuals frequently use the PINs assigned to other inmates to disguise the source of their calls.[2]   Incarcerated individuals who use the Securus system also receive notice at the start of each call that their conversations are recorded and monitored.

        i.      Rikers Island

5.      Rikers Island is an island in the East River between Queens and the Bronx that is home to New York City's main jail complex.   Rikers Island contains a number of different facilities which are located in separate buildings; those facilities each contain a number of different housing units.   Currently, approximately 6,000 individuals are

---

[2] Included among the calls discussed herein are calls in which the inmate who is identified as a participant in the call improperly utilized another inmate's PIN to place the call.   In those instances, a member of the investigative team who is familiar with the defendants' voices from having reviewed dozens of recorded calls for each has identified the defendant's voice.

incarcerated on Rikers Island.   Members of the same gang are often placed in the same housing unit on Rikers Island in an attempt to avoid violence among different gangs.

6.      Incarcerated individuals at Rikers Island are not permitted to possess cell phones and must place any telephone calls through consensually monitored and recorded telephone lines of the DOC Securus system.   Based on my training and experience, and information obtained from other law enforcement officers, I am aware that contraband cell phones are often smuggled into Rikers Island by correction officers, often in exchange for bribes from incarcerated individuals.   Contraband cell phones are extremely valuable items within a jail because they allow incarcerated individuals to make telephone calls without being monitored by the DOC.   Cell phones also allow incarcerated individuals to send text messages and use the internet, including looking up information on other incarcerated individuals' criminal cases.   In addition, based on my training and experience, and information obtained from members of the gang, I believe members of the Bloods often use these contraband cell phones in furtherance of their gang activity, including by using the calls to direct or receive instructions to further criminal activity such as narcotics trafficking.

7.      Narcotics, like cell phones, are also contraband in a secure jail facility. I have learned that contraband, including cell phones and narcotics, often sell for many multiples greater than their cost outside a correctional facility.

8.      Due to the need to promote the safety and security of fellow inmates and correction officers, DOC regulations permit the search of an incarcerated individual's cell at any time for contraband, including cell phones and narcotics.

II.        The Defendants

9.        KRYSTLE BURRELL has been a correction officer with DOC since approximately June 2016.   During the relevant time period, BURRELL was a corrections officer at the Anna M. Kross Center ("AMKC") on Rikers Island and assigned to the housing area where TERRAE HINDS was incarcerated.

10.        TERRAE HINDS is pending trial in New York County Supreme Court on charges including possession of a loaded firearm in connection with a shooting.   From his arrest by the NYPD or about May 3, 2021, until approximately October 19, 2021, when he was released from pretrial custody on bond, HINDS was primarily detained at AMKC on Rikers Island.   HINDS is believed to be a member of the Bloods.   HINDS' nicknames with the Bloods include "Tomato Sauce."

III.        The Bribery Conspiracy

11.        As set forth below, there is probable cause to believe that KRYSTLE BURRELL accepted money in exchange for smuggling contraband to TERRAE HINDS while he was detained at AMKC, facilitating HINDS' contraband smuggling business at AMKC, and permitting HINDS and other inmates to violate DOC regulations during their incarceration.

12.        As part of this conspiracy, KRYSTLE BURRELL smuggled at least two contraband cell phones to TERRAE HINDS while he was incarcerated at AMKC. HINDS used a cell phone that previously belonged to BURRELL.   While he was incarcerated on Rikers Island, HINDS called BURRELL on more than 200 occasions by dialing a phone number for her ending in –3838 (the "-3838 Phone"), including on or about

June 25, 2021.   Beginning July 8, 2021, HINDS began receiving calls on the -3838 Phone

number while he was detained at AMKC from other incarcerated individuals using the

Securus system.

13.     On or about July 23, 2021, DOC Emergency Service Unit conducted a

search of the housing area where HINDS and other individuals believed to be Bloods

members were incarcerated.   During the search, DOC found a cell phone in HINDS' cell.

DOC also recovered a cell phone charger during the search.   To date, law enforcement has

been unable to determine if the cell phone recovered during the search is the -3838 Phone or

a different cell phone smuggled into Rikers Island.

14.     During the same search, DOC found another cell phone in the unit's

common area.   Although this phone is not the -3838 Phone, DOC determined that the phone

was previously used by KRYSTLE BURRELL because the phone extraction report indicated

that the phone had been paired with, or previously been connected to, "Krystle's AirPods,"

matching the first name of BURRELL.   The phone extraction report also indicated that a

username associated with the phone is "Tomatoe Sauce," a slight misspelling of one of

TERRAE HINDS' nicknames.

15.     On or about July 23, 2021, a DOI investigator and I conducted a

voluntary interview of KRYSTLE BURRELL.   During the interview, BURRELL initially

denied bringing a cell phone into Rikers Island, but then later stated that she helped bring a

cell phone in because she was threatened with a weapon.   BURRELL stated that she had

never received phone calls from any of the incarcerated individuals in the housing unit.   As

set forth below, I believe that BURRELL lied during this interview because she received

7

payments from TERRAE HINDS, received telephone calls from him and another incarcerated individual, and she is in a personal relationship with HINDS.   Subsequently, DOC suspended BURRELL for 30 days, and she is currently on modified duty without access to her badge or firearm.

16.     After this interview, KRYSTLE BURRELL received a call from TERRAE HINDS through the Securus phone system.   During that phone call, BURRELL implied to HINDS that she was in trouble.   In sum and substance, HINDS responded that there would not an issue because he did not get in trouble (presumably for being found with the contraband cell phone).

17.     In addition to smuggling contraband into Rikers Island, KRYSTLE BURRELL accepted money from Rikers Island inmates to whom TERRAE HINDS sold contraband to further HINDS' distribution of narcotics and other contraband items at AMKC.   Records obtained from Cash App and Zelle show that, between June 4, 2021 and July 23, 2021, BURRELL received at least $9,780 in transactions on her Cash App and Zelle accounts related to HINDS and/or his contraband business.[3]   For example, on or about July 9, 2021, HINDS asked BURRELL on a phone call recorded on the Securus system to "check for me."   HINDS then asked if the "last ones that was there" "was a 50 and a 3."   BURRELL confirmed.   BURRELL then told HINDS there was also a "100" and "two 3s."   Records obtained from Cash App show that, in the 24 hours preceding this call, BURRELL

_____

[3] Personal identifying information to include name, email address, and the last four digits of her social security number links BURRELL to these Cash App and Zelle accounts.

8

received in her Cash App account, in separate transactions, $50, $300, $100, $300 and $300, corresponding to the amounts discussed on the call.   Cash App records also indicate that numerous other individuals attempted to send money to BURRELL but were blocked by Cash App.

18.     Many of the payments KRYSTLE BURRELL received or attempted to receive in Cash App listed the nicknames of inmates or locations on Rikers Island in the subject line of the transaction. For example, on or about July 10, 2021, BURRELL received $200 via Cash App with the subject line "dimes 13 upper," which I believe is a reference to the nickname of an inmate and his location (AMKC, Housing Area 13 Upper). BURRELL received several other payments via Cash App with similar subject lines.   Although BURRELL used some of the money she received for HINDS' benefit, BURRELL deposited most of the remainder of the funds she received in her personal bank account and used those funds to pay for personal expenses such as car payments.

19.     Phone calls also demonstrate that the payments KRYSTLE BURRELL received on behalf of TERRAE HINDS were in furtherance of his contraband smuggling business.   For example, on or about July 8, 2021, HINDS used the Securus system to speak with another inmate, an individual believed to be a member of the Bloods incarcerated at AMKC but in a different housing unit than HINDS and whose identity is known to your affiant ("Inmate 1").   During the call, HINDS told Inmate 1 that he had "5 for you" in exchange for "2300."   Inmate 1 stated that he had to send the payment through Cash App or another mobile payment service.   HINDS then provided the Cash App name for BURRELL's account.   That same day, an individual attempted to send $2,300 on three

separate occasions to BURRELL's Cash App account, but the transactions were blocked by Cash App.   The subject line of these transactions listed Inmate 1's nickname.

20.     On or about July 9, 2021, TERRAE HINDS used the Securus system to speak with Inmate 1.   During the call, Inmate 1 told HINDS that Inmate 1 was about to send HINDS "eight."   Inmate 1 then asked if HINDS would "do something up top for me." HINDS stated that he would give the Bloods member "two packs next week" if he received "a quarter of a page right now."   Based on my training and experience, I believe "a page" refers to a sheet of paper soaked with liquid K2, a synthetic cannabinoid that is considered contraband at Rikers Island.   That same day, an individual attempted to send $800 to KRYSTLE BURRELL's Cash App account but the transactions were blocked by Cash App. The subject line of the transactions listed the nickname of Inmate 1.

21.     As another example, on or about July 21, 2021, an individual incarcerated at AMKC believed to be a member of the Bloods and whose identity is known to your affiant ("Inmate 2") discussed with a non-incarcerated individual the difficulty the non-incarcerated individual was having preparing narcotics.   The next day, Inmate 2 requested that the non-incarcerated individual send $1,200 to BURRELL's Cash App account.   At the same time, BURRELL received $1,200 on Cash App with Inmate 2's nickname written in the subject line.   In total, between June 3, 2021 and July 21, 2021, BURRELL received approximately $2,050 from this individual.

22.     KRYSTLE BURRELL also had direct communication with one of TERRAE HINDS' customers for the purpose of receiving funds on behalf of HINDS' contraband smuggling business.   For example, on or about June 3, 2021, BURRELL

received a call on the Securus system from Inmate 1.   Inmate 1 asked BURRELL for her

Cash App account so he could send money.   BURRELL then provided Inmate 1 with her

account, and Inmate 1 told BURRELL that he would send $800.   Subsequently, Inmate 1

called BURRELL again and asked her to request $800 through Zelle because the Cash App

transaction was unsuccessful.   Later that day, a known associate of Inmate 1 sent

BURRELL $800 through Zelle.   On June 4, 2021, BURRELL, HINDS, and Inmate 1 had a

three-way phone call on the Securus phone system during which Inmate 1 told HINDS he

sent the "rest through Cash App."   HINDS asked BURRELL if she received the money, and

BURRELL confirmed.   HINDS then directed Inmate 1 to "come up," which I believe

means, based on my training and experience, that Inmate 1 should come to HINDS' housing

area to receive the contraband.   Later that day, in a separate phone call, BURRELL

complained to HINDS about the people he was "dealing with" because they sent money to

BURRELL through a method that had her "home number" and "email," indicating that

BURRELL wanted to conceal that she was receiving payments for contraband on behalf of

HINDS.

         23.     KRYSTLE BURRELL also sent money on behalf of TERRAE HINDS

to further his personal narcotics or other contraband purchases at AMKC.   As one example,

on or about July 11, 2021, HINDS asked BURRELL to send $125 to a Cash App account.

When BURRELL asked what it was for, HINDS replied, "for what I smoke."   BURRELL

then paid another individual $125 through Cash App.   In addition, on or about July 17,

2021, BURRELL sent an individual $1000 via Cash App, with a subject line reflecting that it

was for "tomato sauce," which is a reference to HINDS' nickname.

24.     Finally, KRYSTLE BURRELL also permitted TERRAE HINDS and others to violate DOC regulations.   As one example, surveillance video shows that BURRELL, while on duty, allowed HINDS and other gang members to be outside their cells at 11:48 p.m., even though the cell doors should have been locked for the night beginning at 9:00 p.m., and allowed them to openly smoke in the housing area in violation of DOC policy.

25.     DOC regulations do not permit personal or romantic relationships between correction officers and incarcerated individuals.   However, KRYSTLE BURRELL and TERRAE HINDS appear to be in a romantic relationship.   For example, on or about June 25, 2021, in a call through the Securus system, BURRELL and HINDS said, "I love you" to each other and they mimicked a kiss over the phone.   On or about October 17, 2021, in a call through the Securus system, BURRELL and HINDS discussed their sexual relationship, and HINDS implied that BURRELL had a previous sexual encounter with him when he was incarcerated.   In another call, BURRELL stated that "nobody f***ing touch me since July," which is when BURRELL was suspended by DOC.

26.     Further, KRYSTLE BURRELL assisted with organizing TERRAE HINDS' family to pay his bail and secure his release from Rikers Island.   In a series of calls, BURRELL discussed with HINDS the logistics of securing his bail.   On or about October 17, 2021, BURRELL told HINDS that he would be released imminently and that she would pick him up from Rikers Island.

27.     In addition, since TERRAE HINDS has been released on bond, KRYSTLE BURRELL has continued to assist or attempt to assist gang members on Rikers Island on behalf of HINDS.   For example, on or about November 21, 2021, an inmate whose

identity is known to your affiant ("Inmate 3") used the Securus system to call HINDS.

HINDS then gave the phone to BURRELL and Inmate 3 asked BURRELL for the WiFi

password on Rikers Island.   BURRELL stated that she would attempt to learn it from

another individual.   On or about March 14, 2022, HINDS, BURRELL and Inmate 3 had a

three-way call through the Securus system where Inmate 3 appears to ask BURRELL to be

an intermediary for payments to another correction officer to smuggle contraband.   During

the call, Inmate 3 asked BURRELL, "Yo sis . . . what's the word" and BURRELL replied,

"He said he spoke to you or he was coming to speak to you or something."   Inmate 3 told

BURRELL that "he's" a liar, who I believe means the unnamed correction officer.   Inmate 3

appeared to express his frustration with the correction officer not meeting him even after

Inmate 3 got everything "sturdy" (which I believe means ready) including "bread" (which I

believe means money).   HINDS asked BURRELL to text "him" while they were on the

phone.   BURRELL stated that she texted him and was waiting for an answer.   During the

call, BURRELL then stated, "he's FaceTiming me," meaning he was calling her via video,

and HINDS and Inmate 3 told her to answer the call.

       WHEREFORE, your deponent respectfully requests that the defendants

KRYSTLE BURRELL and TERRAE HINDS be dealt with according to law.

       I further request that the Court issue an order sealing, until further order of the

Court, all papers submitted in support of this application, including the affidavit and arrest

warrants.   Based upon my training and experience, premature disclosure of the contents of

this affidavit and related documents will seriously jeopardize the investigation, including by

13

giving the defendants an opportunity to flee from prosecution, destroy or tamper with

evidence and change patterns of behavior.

Dianna Oglio
Special Agent
United States Department of Homeland Security,
Homeland Security Investigations

Sworn to before me by telephone this
31st day of March, 2022

*Vera M. Scanlon*

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

The property to be searched is a pink Apple iPhone belonging to defendant Krystle Burrell, referred to as the "Device."  The Device has IMSI number 313100006897975.  A photograph of the device is below:



This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.       All records relating to violations of 18 U.S.C. § 1952(a)(3) (use of facilities in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of bribe receiving); and 18 U.S.C. § 371 (conspiracy to violate the Travel Act) (the "Subject Offenses") and involving Krystle Burrell (the "Subject Target") and Terrae Hinds since June 1, 2021, including:

   a.  All records and communications related to the Subject Offenses including but not limited to, call record details, electronic mail, chat logs, and text and electronic messages evidencing communications between and among the Subject Target and known and unknown co-conspirators;

   b.  All records and information concerning payments to correction officers and/or the smuggling or sale of contraband on Rikers Island

   c.  All records and information concerning the identity or location of co-conspirators and other participants in the Subject Offenses, including address books, names, lists of names, phone numbers and addresses of individuals suspected to have participated in the Subject Offenses;

   d.  All images, videos, audio recordings and other recordings relating to the Subject Offenses;

   e.  All records and information, including photographs, evidencing a personal relationship between Terrae Hinds and Krystle Burrell;

   f.  All evidence pertaining to the Subject Target's state of mind as it relates to the Subject Offenses under investigation, including evidence relating to the Subject Target's knowledge, involvement and/or participation in the Subject Offenses;

   g.  All bank records, checks, credit card bills, account information, and other financial records such as records from mobile payment applications Cash App and Zelle;

   h.  All records and information related to the planning, coordination and commission of the Subject Offenses, including all geo-location data, internet protocol connections, Global Positioning Satellite (GPS) entries, and other location entries, including Cell Tower and Wi-Fi entries, for the Subject Target as it relates to the Subject Offenses;

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    22-MJ-437 |
| IN THE MATTER OF THE SEARCH OF A PINK APPLE IPHONE BELONGING | ) | |
| TO DEFENDANT KRYSTLE BURRELL WITH IMSI NUMBER 313100006897975 | ) | |
| AND CURRENTLY LOCATED IN THE EASTERN DISTRICT OF NEW YORK | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

**YOU ARE COMMANDED** to execute this warrant on or before _____April 28, 2022_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____4/15/2022 at 3:00 p.m._____      /s/ Roanne L. Mann
                                                                                                *Judge's signature*

City and state:      _____Brooklyn, New York_____      Hon. Roanne L. Mann      U.S.M.J.
                                                                                         *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    22-MJ-437 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

### ATTACHMENT A

The property to be searched is a pink Apple iPhone belonging to defendant Krystle Burrell, referred to as the "Device."  The Device has IMSI number 313100006897975.  A photograph of the device is below:



This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.          All records relating to violations of 18 U.S.C. § 1952(a)(3) (use of facilities in interstate commerce with intent to promote, manage, establish, carry on, or facilitate the promotion of bribe receiving); and 18 U.S.C. § 371 (conspiracy to violate the Travel Act) (the "Subject Offenses") and involving Krystle Burrell (the "Subject Target") and Terrae Hinds since June 1, 2021, including:

   a.  All records and communications related to the Subject Offenses including but not limited to, call record details, electronic mail, chat logs, and text and electronic messages evidencing communications between and among the Subject Target and known and unknown co-conspirators;

   b.  All records and information concerning payments to correction officers and/or the smuggling or sale of contraband on Rikers Island

   c.  All records and information concerning the identity or location of co-conspirators and other participants in the Subject Offenses, including address books, names, lists of names, phone numbers and addresses of individuals suspected to have participated in the Subject Offenses;

   d.  All images, videos, audio recordings and other recordings relating to the Subject Offenses;

   e.  All records and information, including photographs, evidencing a personal relationship between Terrae Hinds and Krystle Burrell;

   f.  All evidence pertaining to the Subject Target's state of mind as it relates to the Subject Offenses under investigation, including evidence relating to the Subject Target's knowledge, involvement and/or participation in the Subject Offenses;

   g.  All bank records, checks, credit card bills, account information, and other financial records such as records from mobile payment applications Cash App and Zelle;

   h.  All records and information related to the planning, coordination and commission of the Subject Offenses, including all geo-location data, internet protocol connections, Global Positioning Satellite (GPS) entries, and other location entries, including Cell Tower and Wi-Fi entries, for the Subject Target as it relates to the Subject Offenses;

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.